**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

ZOLA H., et al.,

      Plaintiffs,

v.                                    Case No. 12-14073

RICK SNYDER, et al.,

      Defendants.

                                  /

**OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS**

Plaintiffs, adoptive parents, nineteen adopted children (proceeding through a "next friend," *see Whitmore v. Arkansas*, 495 U.S. 149, 162-64 & n.4 (1990)), and three adoptive siblings (that is, biological children of the adoptive parents), sue the governor of Michigan, managers in the Michigan Department of Human Services (DHS), county branches of the DHS, the county branches' officials and social workers, social-service contractors, and the contractors' employees. Plaintiffs allege that social workers mistreated children awaiting adoption, that social workers failed to disclose children's disabilities to adoptive parents, that social workers harassed and intimidated adoptive parents, and that the State has withheld child-welfare payments. The parties submit hundreds of pages of briefing contesting five motions to dismiss the 133-page complaint. No hearing is needed, *see* E.D. Mich. LR 7.1(f)(2); each motion will be granted.

## I.  BACKGROUND

Plaintiffs sue four government offices, twenty-six government officials, four

adoption charities, and fifteen charity workers—forty-nine defendants in all.  Fourteen

Defendants—ten of the government officials and the four government offices—are sued

only in an official capacity.  Thirty-five Defendants are alleged to have individual liability,

but twenty-eight of the thirty-five are never accused in the complaint of any specific

wrongdoing.  The accusations against the remaining seven Defendants arise from only

four of the nineteen referenced adoptions.  As will become clear, at present only those

four require description (the four in any case resemble the others).  The allegations that

follow come from the complaint and are, at this stage, accepted as the truth.  *See*

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### A.  Amelia C.

Mr and Mrs C. began caring for Amelia C. in 2007, when she was four months

old; but they accepted her temporarily, as an "emergency" placement, and formed no

plan to keep her.  Unidentified DHS agents ignored Amelia's signs of alcohol and drug

withdrawal, and they failed to tell Mr and Mrs C. of Amelia's mother's drinking during

pregnancy.  They apparently told Mr and Mrs C. of Amelia's skin infection and syphilis,

but they never said how to manage or limit the infection, and they never had Amelia

tested for other diseases.  They refused to register Amelia for benefits, and one of them,

upon inquiry, "angrily" told Mr and Mrs C. of Amelia's fine health—her habit of running

herself into the wall notwithstanding.

For more than a year Mr and Mrs C. declined to adopt Amelia.  In February 2008,

the DHS sent Mr and Mrs C. a letter reporting other couples' interest in Amelia and

2

asking Mr and Mrs C. to decide promptly, within four days, whether to adopt her.  They

agreed to.  They then tried again, several times, to obtain benefits for her.  Unnamed

DHS agents obstructed Mr and Mrs C. by threatening to investigate them, by providing

incomplete applications, by neglecting to process applications, and by wrongfully

denying an application.  Although Mr and Mrs C. asked in writing to delay the adoption,

in April 2009 the DHS scheduled, without notice, and six days apart, two adoption

hearings; at the hearings, in their absence, Mr and Mrs C. became Amelia's adoptive

parents.  When they learned of the adoption, Mr and Mrs C. went to a DHS county

office, where they met Linda Keller, the only Defendant Amelia names in the complaint.

Keller refused to answer questions and, handing Mr and Mrs C. the order of adoption,

said, "She's yours now."

Amelia attacked Mr and Mrs C.'s granddaughter, and tried repeatedly to kill their

dog.

### B.  Gary and Michael G.

Defendant Catholic Services of Macomb (CSM) placed for adoption Gary G. and

his brother Michael G.  Mr and Mrs G. paid to adopt Gary and Michael but say that CSM

should have charged its fee to the State.

Gary's adoption became final in November 1996.  Before the adoption CSM

failed to report signs that Gary's birth parents abused him, failed to tell Mr and Mrs G.

that Gary displayed signs of fetal exposure to alcoholism, failed to obtain psychological

testing or treatment, and failed to tell Mr and Mrs G. about available benefits.  The DHS

later ignored Mr and Mrs G.'s requests for benefits and for reimbursement of the money

paid to CSM.

3

A CSM manager, Defendant Joanne Ales, often asked Mr and Mrs G. to adopt Michael; in time, they did; the adoption became final in August 1999.  Michael arrived from his birth parents with marks of abuse, with signs of sexual molestation, and with signs of prenatal harm, none of which CSM had reported to the authorities or to Mr and Mrs G.  Ales declined to speak to Mr and Mrs G. about Michael's abuse and disability, and she said Mr and Mrs G. needed to pay her to arrange a psychological evaluation that should have been free.  Although testing revealed that Michael suffers from reactive attachment disorder, a "complex psychiatric illness" that causes disruptive and dissociative behavior and that, "without treatment, . . . can affect permanently a child's social and emotional development,"[1] Ales, after hearing the diagnosis, told Mr and Mrs G., "All you have to do is love [Michael] and he'll be fine.  Ales told Mrs G., "If you ask for an adoption subsidy, we'll take [Michael] away."  Mrs G. "wrote requests" for benefits, apparently to the DHS, for the next seven years.  Eventually a hearing occurred, and an administrative law judge ordered the DHS to process an application for benefits.  The DHS complied and denied the application, and a probate court affirmed the DHS's decision (which Mr and Mrs G. call "fraudulent").

Michael breaks windows and doors, sets fires, beats and bites his family, and exposes himself.

---

[1] *Reactive Attachment Disorder*, American Academy of Child & Adolescent Psychiatry, http:// www.aacap.org/ AACAP/ Families_and_Youth/ Facts_for_Families/ Facts_for_Families_Pages/ Reactive_Attachment_Disorder_85.aspx (websites visited Aug. 26, 2013) (spaces inserted in each URL reference).

### C.  Zola H.

Defendant Oakland Family Services (OFS) placed Zola H. with Mr and Mrs H.; the adoption became final in April 2011.  OFS failed to tell Mr and Mrs H. that Zola had been twice hospitalized before her adoption.  Defendant Latrice Neal failed, when meeting with Mr and Mrs H., to mention Zola's sickle-cell disease.  *See Sickle Cell Disease*, Centers for Disease Control and Prevention, http:// www.cdc.gov/ ncbddd/ sicklecell/ facts.html.  When Mr and Mrs H. sought Zola's medical records, Defendant Rachel Lubetsky stated that the DHS had none.  Someone, perhaps a DHS agent, gave Mr and Mrs H. an incomplete benefits application.  When Mr and Mrs H. asked about benefits for Zola, Defendant Lisa Westphal said Zola did not qualify.  Mr and Mrs H. waived benefits (as a result, they say, of fraud).

Since her adoption, Zola has had multiple surgeries and blood transfusions and has been hospitalized a dozen times.

### II.  STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to state a claim for relief that is plausible on its face."  *Iqbal*, 556 U.S. at 678.

### III.  DISCUSSION

Plaintiffs sue different types of defendants (government and private) in different capacities (official and personal) and with different measures of factual allegation (often none at all).  Defendants, in shifting alignments, raise an array of arguments of both broad and discrete application.  In addressing the five motions to dismiss, attentive categorization is therefore essential.

5

### A. The State Defendants

### 1. Official Capacity

Against the State, Plaintiffs seek an award of compensatory damages, an injunction requiring the payment of child welfare, and several other broad injunctions and declaratory judgments. "Not every violation of a right yields a remedy," however. *Kiyemba v. Obama*, 555 F.3d 1022, 1027 (D.C. Cir. 2009), *vacated*, 130 S.Ct. 1235 (2010), *reinstated*, 605 F.3d 1046 (2010). The fastest way to see the flaws in the action against the State Defendants as officials is to assume the violation of a right, and then look for an available remedy—and none appears.

### a. Monetary Relief (Sovereign Immunity)

The doctrine of sovereign immunity—an implicit constitutional principle, partly confirmed by the Eleventh Amendment, *Hans v. Louisiana*, 134 U.S. 1, 10-16 (1890); *In re State of N.Y.*, 256 U.S. 490, 497 (1921); *Alden v. Maine*, 527 U.S. 706, 728-29 (1999)—bars a federal action against a State absent its consent. Sovereign immunity governs an action against a state official if the plaintiff in effect seeks relief from the State, *Pennhurst St. Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984), such as money from the State treasury, *Edelman v. Jordan*, 415 U.S. 651, 663 (1974). The State Defendants, when acting as officials, can pay Plaintiffs only the State's money. An action against them as officials for money, including for child-welfare payments, is therefore barred. *See Ernst v. Rising*, 427 F.3d 351, 367-72 (6th Cir. 2005) (*en banc*); *Barton v. Summers*, 293 F.3d 944, 950 (6th Cir. 2002).

Plaintiffs present a series of unconvincing responses to the bar. First, they cite a DHS manual as a waiver of sovereign immunity. But the manual warns merely that the

6

Eleventh Amendment will not protect a misbehaving employee from *personal* liability. (Dkt. # 47 Pg ID 2085.)  That does Plaintiffs no good, because personal liability is not sovereign liability—the manual waives nothing.  *See also Pennhurst*, 465 U.S. at 99 (noting that a waiver of sovereign immunity must be "unequivocal").  Second, Plaintiffs say that they may try to invoke the theory of *Ex Parte Young*, 209 U.S. 123 (1908).  Perhaps so, but *Ex Parte Young* applies only if "the relief sought is . . . equitable and prospective."  *Westside Mothers v. Haveman*, 289 F.3d 852, 860 (6th Cir. 2002).  *Ex Parte Young* notwithstanding, sovereign immunity bars a request for relief from the State that will "lead inexorably to the payment of state funds."  *Ernst*, 427 F.3d at 371. Third, Plaintiffs assert a claim under the Americans with Disabilities Act, and they say that that claim, at least, may proceed, because the ADA, remedial legislation under § 5 of the Fourteenth Amendment, *see Tennessee v. Lane*, 541 U.S. 509, 518 (2004), abrogates sovereign immunity, 42 U.S.C. § 12202.  But the complaint alleges a violation only of the ADA's anti-retaliation provision, 42 U.S.C. § 12203, under which money damages are unavailable, *Kramer v. Banc of Am. Secs., LLC*, 355 F.3d 961, 965 (7th Cir. 2004).  Fourth, Plaintiffs argue at length that "municipalities no longer retain[] sovereign immunity."  (Dkt. # 47 Pg ID 2002 (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 67 n.7 (1989)).)  There is, however, no "municipality" in this action.  Finally, Plaintiffs say that "sovereign immunity does not protect against violations of Medicaid regulations" and that "this [abrogation of sovereign immunity]" applies here "because Medicaid must accompany" child-welfare payments.  (Dkt. # 47 Pg ID 2000-01.)  No explanation accompanies this abstruse argument, which is therefore waived.  *See White Oak Dev., LLC v. Wash. Township*, 606 F.3d 842, 850 (6th Cir. 2010); *Romo v. Largen*,

___ F.3d ___, 2013 WL 3801640 (6th Cir. July 23, 2013) (Sutton, J., concurring in part

and in the judgment) (noting that a brief waives an issue if "it leaves the reader guessing

what [the party] means to argue").  Plaintiffs cite *Rosie D. v. Swift*, 310 F.3d 230, 237

(1st Cir. 2002), and *Reynolds v. Guiliani*, 118 F. Supp. 2d 352, 382 (S.D.N.Y. 2000), but

those cases hold merely that nothing in the Medicaid Act forecloses the kind of

prospective injunctive relief normally allowed under *Ex Parte Young*.  They never

contradict the Sixth Circuit authority prohibiting an injunction against the State that will

"lead inexorably to the payment of state funds."  *Ernst*, 427 F.3d at 371.

The parties disagree about whether a DHS county branch constitutes a State

office with sovereign immunity.  At first each side declared a position without

explanation.  In an invited supplemental brief, however, the State Defendants establish

that the DHS, main office and county branches together, receives per year more than a

billion dollars from the State, and less than thirty-three million from local sources.  *See*

2012 Mich. Pub. Acts 200 p.143, http:// www.legislature.mi.gov/ documents/ 2011-2012/

publicact/ pdf/ 2012-PA-0200.pdf.  Defendants report that within the DHS, the main

office writes each policy manual, creates each training course, and controls each matter

of hire and discipline.  (Dkt. # 58, Ex. 57.)  The State pays any judgment against a

county branch.  *See* Mich. Comp. Laws § 18.1396; *Lintz v. Skipski*, 807 F. Supp. 1299,

1303 n.3 (W.D. Mich. 1992).  Accordingly, a county branch, as part of the State, is

invested with sovereign immunity.

"A court may enter a prospective injunction that costs the state money . . . if the

monetary impact is ancillary, *i.e.*, not the primary purpose of the suit."  *Ernst*, 427 F.3d

at 371.  Plaintiffs might succeed, later, at demonstrating their entitlement to an

8

injunction that requires the State to comply with federal child-welfare law and that "happens" to result in the payment of money to Plaintiffs.  At present, however, Plaintiffs offer neither authority nor argument (as opposed to bare assertion) showing that they seek money "ancillary" to other relief.

### b.  Injunctive Relief (Mootness)

There are problems with the injunctive relief sought beyond just the fiscal implications.  For one thing, Plaintiffs seek too much.  They want, for example, an injunction commanding the DHS "to reform [its] adoption system" to "compl[y]" with "the Americans with Disabilities Act, the Rehabilitation Act, 42 U.S.C. [§] 1983," and several other laws.  (Dkt. # 1 Pg ID 132.)  That is the pattern of an unwarrantable "obey-the-law" injunction.  *See E.E.O.C. v. Wooster Brush Co. Emp. Relief Ass'n*, 727 F.2d 566, 576 (6th Cir. 1984); *S.E.C. v. Goble*, 682 F.3d 934, 949 (11th Cir. 2012).  Nonetheless, overbreadth is, at this stage, the small problem.  The big problem is that the adopted children have been adopted.  An order of adoption places a child wholly in the custody of her adoptive parents, Mich. Comp. Laws § 710.60, and no Plaintiff seeks to disturb an adoption order.  Plaintiffs say they want to stop the State Defendants' "harassing" and "intimidating" behavior.  But the State Defendants' alleged mistreatment of Plaintiffs during the adoption process is over.  And although mistreatment allegedly continued after the adoptions, Plaintiffs never identify and seek to enjoin specific, ongoing wrongful conduct not directly connected to the granting of benefits.  Whatever harm Plaintiffs suffered in the past, a non-monetary injunction will not affect them now.  This part of the action is moot.  *See DeFunis v. Odegaard*, 416 U.S. 312, 316-19 (1974).

9

*31 Foster Children v. Bush*, 329 F.3d 1255 (11th Cir. 2003), declared part of an action moot in a similar situation.  Alleging "widespread deficiencies in [Florida's] foster care system," the plaintiffs sought equitable relief, including an injunction against "arbitrary and capricious actions," the placing of children "into unnecessary state-created danger," and the denial, "without an adequate and fair procedure," of "state-created entitlements."  329 F.3d at 1261-62.  Two of the plaintiffs were adopted during the appeal.  *Bush* states: "Because [the two children] have been adopted, they are no longer in the defendants' legal or physical custody and therefore cannot be further harmed by the defendants' alleged illegal practices.  Because the plaintiffs . . . seek[] only prospective injunctive relief against the defendants to prevent future harm, no live controversy exists[.]"  329 F.3d at 1263.  Plaintiffs here, like the plaintiffs in *Bush*, seek to alter the future operation of an adoption process that allegedly harmed them, but that almost definitely will not harm them again.  And to the extent they seek a remedy for wrongs after an adoption, Plaintiffs here, like the plaintiffs in *Bush*, request relief too vaguely to avoid mootness.

### c.  Declaratory Relief

Because Plaintiffs establish no entitlement to injunctive relief, declaratory relief is neither proper nor prudent.  *See Apple, Inc. v. Motorola, Inc.*, 869 F. Supp. 2d 901, 923-24 (N.D. Ill. 2012) (Posner, J.).  There is therefore no remedy to be had from the State Defendants as officials.

10

## 2.  Individual Capacity

### a.  Jurisdiction

The relevant State Defendants, responding to the claims against them as individuals, raise several jurisdictional defenses, each of which is either defective or indistinct.

Federal Rule of Civil Procedure 10(a) requires a complaint to name each party. If there is a compelling need for secrecy—as when the plaintiff is a child, for example—a plaintiff may, with leave from the district court, proceed under a pseudonym.  *Doe v. Porter*, 370 F.3d 558, 560 (6th Cir. 2004).  The State Defendants assert, without authority or argument, that Plaintiffs cannot now repair their failure to first seek permission to proceed anonymously, and that the entire action must therefore be dismissed for lack of jurisdiction.  The State Defendants narrow the argument, although insufficiently, in a reply, saying that only some of the anonymous Plaintiffs had to ask to use a pseudonym, but continuing to assert that the action brought by those Plaintiffs must end.  A State's defendants, in an action involving the State's citizens, and in the absence of controlling authority, might do better to "reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits."  *Conley v. Gibson*, 355 U.S. 41, 48 (1957).  In any event, there is no support for the State Defendants' argument.  Indeed, where the complaint names the wrong plaintiff, Rule 17(a)(3) allows "a reasonable time . . . for the real party in interest to ratify, join, or be substituted into the action," after which "the action proceeds as if it had been originally commenced by the real party in interest."  *See EW v. NY Blood Ctr*, 213

11

F.R.D. 108, 109-10 (E.D.N.Y. 2003); *Doe v. Barrow Cnty, Ga.*, 219 F.R.D. 189, 192 (N.D. Ga. 2003).

The State Defendants contend that the "domestic relations" exception to federal jurisdiction bars most of the action.  The exception applies, however, only to an action in which the plaintiff "sues in federal court for divorce, alimony, or child custody."  *Catz v. Chalker*, 142 F.3d 279, 292 (6th Cir. 1998), *overruling on other grounds recognized*, *Coles v. Granville*, 448 F.3d 853, 859 n.1 (6th Cir. 2006); *see* 13E Wright & Miller, Federal Practice & Procedure § 3609 & n.8 (3d ed. 2009).  There are no exceptions to the exception: *Ankenbrandt v. Richards*, 504 U.S. 689, 702-04 (1992), holds that a federal court is divested not of the power to decide a tort action connected to an adoption, but of the power literally to issue a child-custody decree.  The parents in this action, in suing State agents as individuals, seek payment for the alleged neglect and ill-treatment they suffered during and after the adoption process.  They seek neither to gain nor to yield custody of a child.  The State Defendants' argument that the domestic relations exception nonetheless applies stands on authority that predates *Ankenbrandt*. *See*, *e.g.*, *Zak v. Pilla*, 698 F.2d 800, 801 (6th Cir. 1982).

The State Defendants say that most of the action is barred by the *Rooker-Feldman* doctrine, which prohibits a party that loses an action in state court from seeking in federal court a rejection of the adverse state-court order or judgment.  *Berry v. Schmitt*, 688 F.3d 290, 298-99 (6th Cir. 2012).  But Plaintiffs never ask to have a state-court order or judgment enjoined, set aside, or declared unlawful.  *See Berry*, 688 F.3d at 300; 18B Wright & Miller, *supra* § 4469.1.  The State Defendants note that evidence produced in this action might show that some state-court adoption orders

12

stand on faulty conclusions of fact; but *Rooker-Feldman* neither "bar[s] federal jurisdiction simply because . . . a matter [was] previously litigated in state court" nor "address[es] potential conflicts between federal and state court orders." *Berry*, 688 F.3d at 298-99. Plaintiffs never attack a state-court order or judgment and, therefore, *Rooker-Feldman* does not apply.

The State Defendants raise the possibility of abstention under *Younger v. Harris*, 401 U.S. 37 (1971), and the requirement that a plaintiff exhaust an administrative remedy, but do not develop either point. Without discussion in briefing it is hard to tell what, if anything, might be barred by *Younger* or by a failure to exhaust. The court need not speculate, however, because *Younger* abstention is not jurisdictional, *Chase Bank USA, N.A. v. Cleveland*, 695 F.3d 548, 558 (6th Cir. 2012); *Kaufman v. Kaye*, 466 F.3d 83, 88 n.1 (2d Cir. 2006), and the State Defendants cite no jurisdictional exhaustion requirement, *see Bangura v. Hansen*, 434 F.3d 487, 493 n.1 (6th Cir. 2006); *Bartlett v. U.S. Dept. of Agric.*, 716 F.3d 464, 472 (8th Cir. 2013). The State Defendants raise also affirmative defenses—*res judicata*, collateral estoppel, and a limitation—which at this stage require no attention. *See Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 464 (6th Cir. 2013); *Gilbert v. Ferry*, 413 F.3d 578, 579 (6th Cir. 2005); *DLX, Inc. v. Kentucky*, 381 F.3d 511, 519 n.4 (6th Cir. 2004).

### b. Failure to Plead

Although the complaint alleges many wrongs by "a DHS worker" or "social workers," only one State Defendant, Linda Keller, is both sued as an individual and accused of specific wrongdoing (and all she allegedly did was refuse to talk with Mr and Mrs C. except to say, of Amelia C., "She's yours now"). The State Defendants enjoy

13

qualified immunity, but, even apart from that, the action against them as individuals

(Keller aside) fails for want of individualized allegation.

In *Bank of America, N.A. v. Knight*, ___ F.3d ___, 2013 WL 4016522 (7th Cir.

Aug. 8, 2013) (Easterbrook, J.), the plaintiff bank alleged that the defendants committed

fraud and drained money from a failing firm.  The district judge dismissed the action for

failure to state a claim because the complaint addressed each defendant at once.  The

court of appeals, affirming, explained that a complaint must allege who did what:

> According to the Bank, its claims do not depend on proof of fraud, so [the
> heightened pleading standard of] Rule 9(b) is irrelevant.  We need not
> decide, because the problem the district court identified spoils the complaint
> as a matter of normal pleading standards.  *Iqbal* and *Twombly* hold that a
> complaint must be dismissed unless it contains a plausible claim.   A
> contention that "the defendants looted the corporation"—without any details
> about who did what—is inadequate.  Liability is personal.  An allegation that
> *someone* looted a corporation does not propound a plausible contention that
> *a particular person* did anything wrong.  The Rules of Civil Procedure set up
> a system of notice pleading.  Each defendant is entitled to know what he or
> she did that is asserted to be wrongful.

*Knight*, ___ F.3d ___, 2013 WL 4016522.  Like the complaint in *Knight*, the complaint in

this action, when it fails "to imput[e] concrete acts to specific litigants," *id.*, fails to state a

plausible claim.  And like the defendants in *Knight*, the State Defendants in this action

(besides Keller) lack notice; each is ignorant of what he supposedly did wrong and, so,

ignorant of how to respond and defend himself.

The complaint's allegations suffice, Plaintiffs argue, because the State should

know from its own records which Defendants worked with which children.  The principle

this point seems to aim for is that a pleading standard may be relaxed if pertinent

information "is *only* within the opposing party's knowledge."  *Yuhasz v. Brush Wellman,*

*Inc.*, 341 F.3d 559, 566 (6th Cir. 2003) (affirming the district court's holding that a

14

plaintiff "is not entitled to a relaxed standard because the information he seeks is not exclusively in the possession of [the defendant]").  Plaintiffs should know who talked to them—or ignored them, harassed them, or lied to them—as well as or better than the State Defendants do.  It is not the defendant's task to guess at which, if any, of an enormous complaint's allegations address her; it is not for her, either by herself or in concert with other defendants, to piece disordered allegations into a functioning case; she need not do the work.  It is the plaintiff who must show that he is *not* guessing when he names a defendant, that he has designed his action, that he has not been careless about suing people.  Plaintiffs appear to name all possible defendants in the hope that some, after being wrung through discovery, will look like the right defendants.  This a plaintiff may not do.

### c.  Qualified Immunity

Keller raises qualified immunity, which protects her from liability under 42 U.S.C. § 1983—the source of Plaintiffs' federal right of action—unless she clearly violated the law.  Plaintiffs must disprove Keller's immunity.  *Sutton v. Metro. Gov. of Nashville & Davidson Cnty*, 700 F.3d 865, 871 (6th Cir. 2012).

There is no standard charge, no trick of pleading, by which a plaintiff may curvet a claim of qualified immunity without an understandable legal analysis.  Indefinite principle does not prevail; a plaintiff may not merely cite a general right and assert its violation.  *Brousseau v. Haugen*, 548 U.S. 194, 198 (2004); *Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987).  A successful deflection of qualified immunity cannot be founded on an unexplained quotation only vaguely on point, or a string of inference unaccompanied by authority.  A plaintiff must establish "beyond debate" the existence,

15

at the time the defendant acted, of a discrete right violated. *Ashcroft v. Al-Kidd*, 131 S.Ct. 2074, 2083 (2011).

Plaintiffs have not come to grips with this standard. The complaint contains lists of putative rights—lists that go on for pages. To confirm the operation of these rights, Plaintiffs offer a block quote, of less than obvious relevance, from a 1988 decision, in another circuit, that was vacated. *See Del A. v. Edwards*, 855 F.2d 1148 (5th Cir. 1988), *vacated*, 862 F.2d 1107 (1988), *appeal dis'd*, 867 F.2d 842 (1989). They cite nothing else. Instead of sustaining the rights at issue, and explaining a violation of each, they repeat "just a sample" of the rights they invoke, assert the validity of them all, and assert that clear violation of each "is readily apparent." (Dkt. # 47 Pg ID 1996-97.) Actual analysis is absent.

Plaintiffs basically contend that the complaint alleges violations of the law too obvious to require elaboration. That is not so, as the action against Keller demonstrates. If a DHS employee refuses to answer a couple's questions about an adoption, and retreats to the authority of an adoption order, what obviously apparent right has she offended? Plaintiffs mention often the right to due process, a right that rarely applies self-evidently outside a courtroom. (It was in a case on due process that Justice Holmes famously wrote, "Such words as 'right' are a constant solicitation to fallacy." *Jackman v. Rosenbaum Co.*, 260 U.S. 22, 31 (1922); *see also Anderson*, 483 U.S. at 639 (noting the ease—and impropriety—of invoking the right to due process abstractly).) Plaintiffs claim the adoption order was uncertified, but they never say why that would mean Keller acted illegally, rather than just rudely and in haste. Plaintiffs speak consistently of plotting and fraud, but never in sufficient detail, *see Bennett v. MIS*

16

*Corp.*, 607 F.3d 1076, 1101 (6th Cir. 2010) (observing that because "claims of fraud can be fabricated easily," a plaintiff must plead fraud with description), and never in express and cogent connection to a federal law.

The complaint asserts claims under state law and Keller may, of course, seek state-law qualified immunity. *See Odom v. Wayne Cnty*, 760 N.W.2d 217 (Mich. 2008). As things stand, however, there is a substantial possibility of the court's relinquishing supplemental jurisdiction, so only federal law needs discussion.

### B. The Private Defendants

To repeat: Plaintiffs fail to engage the issue of qualified immunity or, for the most part, to plead personalized facts, and affirmative defenses and state law as yet need no attention. With these points settled, the remainder of this round of the action comes quickly to an end.

### a. Absolute Immunity

The private Defendants argue that they enjoy federal-law absolute immunity. For a social worker, as for a prosecutor, the margin of absolute immunity runs not with title but with function, the pertinent function in both instances being work at law; petitioning a court, conducting an action, testifying under oath, and so forth. Absolute immunity protects a social worker as she acts as a legal advocate—that is it. *Kovacic v. Cuyahoga Cnty Dept. of Children & Family Servs.*, ___ F.3d ___, 2013 WL 3929859, *3 (6th Cir. July 31, 2013); *Holloway v. Brush*, 220 F.3d 767, 774-77 (6th Cir. 2000). A lot of the complaint alleges deceit or torment outside a legal process. The complaint says, for example, that CSM and Joanne Ales hid from Mr and Mrs G the abuse and illness of Gary and Michael, never informed them about Michael's need for treatment, never

17

informed them about the availability of benefits, and threatened to remove Michael if they applied for benefits.  Although these alleged acts occurred near the time a court approved Gary and Michael's adoption, none of the acts constitutes legal advocacy.  *Cf. Holloway*, 220 F.3d at 776-77 (holding that a social worker lacks absolute immunity for out-of-court acts such as misinforming a parent about her legal rights).

If an amended complaint states an actionable claim, a dispute will arise about which specific acts absolute immunity protects.  At the moment it is enough to say that such immunity affects only a small part of the action.

### b.  State Action

Two groups of private Defendants face specific allegations, CSM and its manager, Ales, and OFS and its workers, Neal, Lubetsky, and Westphal.  Contesting the federal-law claims against them, the two groups raise conflicting but equally successful arguments.  If the private Defendants are state actors—it is possible, *see Bartell v. Lohiser*, 215 F.3d 550, 556-57 (6th Cir. 2000)—then, the OFS group says, qualified immunity applies and, Plaintiffs having neglected the issue, defeats the federal claims.  If they are not state actors, then, according to the CSM group, the federal claims fail because usually only a state actor can be sued under 42 U.S.C. § 1983.  Both groups are right.  (Who is a state actor is, therefore, an issue for another day.)

No doubt the complaint accuses CSM, OFS, and their employees of behaving odiously, but the question arises how they violated *federal* law.  Plaintiffs' failure to present a sound answer has been addressed.  An additional point merits some discussion.  Although they acknowledge that only § 1983 gives or might give a right of action for many of their federal claims, Plaintiffs also search for a right of action in

18

assorted statutes and regulations.  There are two problems here.  First, the counts of the complaint are tangled and in disarray.  Count nine invokes eight laws or rules; count ten alleges the violation of entire sub-chapters of regulations; count six proclaims illimitable "violation of civil rights"—no count approaches precision.  "We no longer insist upon technical rules of pleading, but it will ever be difficult in a jury trial"—or in motion practice—"to segregate issues which counsel do not separate in their pleading, preparation or thinking."  *O'Donnell v. Elgin, J. & E. Ry. Co.*, 338 U.S. 384, 392 (1949) (Jackson, J.).  Second, Plaintiffs address only in passing the issue of allowing a private right of action.  A plaintiff invoking a law must prove that Congress meant to let her use it, *Alexander v. Sandoval*, 532 U.S. 275, 286-88 (2001), in pursuit of a defined end, *Blessing v. Freestone*, 520 U.S. 329, 342-43 (1997).  This type of analysis is absent.

As CSM says, liability under § 1983 typically arises only from the conduct of a state actor.  *Paige v. Coyner*, 614 F.3d 273, 278 (6th Cir. 2010).  True, a private party that conspires with the State to violate someone's rights can at once expose itself to § 1983 yet deprive itself of qualified immunity, *Cooper v. Parrish*, 203 F.3d 937, 952 n.2 (6th Cir. 2000), but no material allegations suggest a conspiracy between State and private actors.  *Cf. Filarsky v. Delia*, 132 S.Ct. 1657, 1666-67 (2012) (discussing other narrow authority not currently applicable, and in any event waived, that constrains a private defendant's invoking qualified immunity).

19

**IV.  CONCLUSION**

IT IS ORDERED that each motion to dismiss [Dkts. ## 29, 32-35] is GRANTED.

Plaintiffs may by **September 24, 2013**, (1) submit a complaint amended in accord with

this order and (2) move for a protective order allowing the use of pseudonym.


　s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  September 3, 2013


I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, September 3, 2013, by electronic and/or ordinary mail.

　s/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522